## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

MISTY SIMMS, next friend of
Caelan Jantuah, an infant, and
MISTY SIMMS, individually

                     Plaintiffs,

v.                                            CIVIL ACTION NO.   3:11-0932

THE UNITED STATES OF AMERICA,

                     Defendant.

### MEMORANDUM OPINION AND ORDER

Plaintiff Misty Simms brought this action for wrongful birth against the United States of America.[1]   The Court granted partial summary judgment to Plaintiff, finding that Defendant breached its duty of care but reserving the issues of causation and damages.   The remaining issues in the action were then tried to the Court on January 27 through 30, 2015.   Based on the findings made herein, the Court **FINDS** in favor of Plaintiff and awards damages in the total amount of $12,116,165.

---

[1] Ms. Simms brought this case individually and on behalf of her infant son, Caelan Jantuah. Under West Virginia law, the parent of a child born with a birth defect can bring a wrongful birth claim against a health care provider who negligently deprived her of her right make to an informed choice regarding the continuation of her pregnancy.   *See James G. v. Caserta*, 332 S.E.2d 872, 879 (W. Va. 1985).   A child born with a birth defect, however, does not have the right to sue such a health care provider under a theory of wrongful life.   *Id.* at 880.   Ms. Simms thus has a cause of action to bring this case individually, but cannot sue the United States on Caelan's behalf. Accordingly, this opinion discusses causation and damages with respect to Ms. Simms's claim and awards damages to Ms. Simms individually.

## I.       CAUSE OF ACTION FOR WRONGFUL BIRTH

The parent(s) of a child who is born with a birth defect may bring a suit for wrongful birth against a health care provider or other responsible party that "failed to discover the birth defect and to advise the parents so that they could intelligently decide whether to forebear having the child or, after the mother has become pregnant, to consider the termination of the pregnancy." *James G. v. Caserta*, 332 S.E.2d 872, 879 (W. Va. 1985).   The theory underlying the cause of action is that the defendant has stripped the parents of the opportunity to make an informed choice regarding the birth of their child.   *Id.*   A wrongful birth action is a tort deriving from the doctrines of medical malpractice and informed consent.   *See id.* at 878.   Accordingly, a plaintiff must prove that the defendant had a duty, breached the standard of care, and caused damages to the plaintiff.

A parent who brings a successful wrongful birth claim can recover "the extraordinary expenses incurred as a result" of the child's birth defect.   *Id.* at 882.   These damages include "the extraordinary costs necessary to treat the birth defect and any additional medical or educational costs attributable to the birth defect during the child's minority" and "also after the child reaches the age of majority if the child is unable to support himself."   *Id.* at 882-83**.**

## II.      FINDINGS OF FACT AS TO CAUSATION

Misty Simms is the mother of Caelan Jantuah and the plaintiff in this civil action.   When she was approximately 18 weeks pregnant, she had a routine appointment for obstetric care with Dr. Booth at Valley Health Systems, on February 25, 2008.   An ultrasound was performed by a staff sonographer and reported by her to Dr. Booth by telephone.   Concerned about possibly abnormal findings from the ultrasound, Dr. Booth instructed the sonographer to arrange for a follow-up examination of Ms. Simms at Cabell Huntington Perinatal Center by Dr. Chaffin. Unfortunately, though the sonographer contacted staff at the perinatal unit, miscommunication

between the offices resulted in a failure to schedule an appointment.   Compounding the mistake, no one spoke with Ms. Simms about the ultrasound results or the need to follow-up with the perinatal unit.   Ms. Simms believed her pregnancy was progressing normally.

Ms. Simms returned to Valley Health for routine appointments on March 12; April 10, 17, and 24; and May 8.   Ms. Simms did not recall having any discussions about the earlier ultrasound or any referral for another ultrasound.   The records of those visits are consistent with her recollection that there were no concerns identified and her pregnancy was normal.   On May 25, 2008, she returned for a routine scheduled visit and underwent another ultrasound.   The nurse who performed it told her that something was wrong, that the fetus might have hydrocephaly. The nurse called Dr. Booth who instructed her to arrange for Ms. Simms to go immediately to the Cabell Huntington Perinatal Unit where she was to see Dr. Singh.

Dr. Singh and a nurse performed another ultrasound at Dr. Singh's office that day. Apparently, as she performed the ultrasound, Dr. Singh began explaining her findings.   By both Plaintiff's and Dr. Singh's accounts, Dr. Singh was quite blunt and direct in presenting her findings.   She stated that Ms. Simms's baby "would never walk or talk and he [would] be severely mentally retarded and have a cleft lip."   Ms. Simms was understandably distraught, and did not recall much more of her discussion with Dr. Singh.   She testified that Dr. Singh left the room and that the nurse then spoke with her.   She recalled the nurse asking her what Dr. Chaffin had said, but Ms. Simms did not know who this doctor was.   She learned then that, as a result of the February 25, 2008 ultrasound, a referral to Dr. Chaffin had been ordered by Dr. Booth, but not made.   The nurse explained that Ms. Simms was at some small risk for early delivery and that the baby's brain might develop more if carried to term.   The nurse offered Ms. Simms the choice of an amniocentesis for further diagnostic purposes but told her there was no treatment for the baby's

condition.   Although Dr. Singh did not note in the chart any discussion of pregnancy termination, she claimed to have told Ms. Simms that a late-term abortion was available in Kansas, a claim Ms. Simms denies.   Dr. Singh went on to testify that patients in similar circumstances often do not comprehend such discussions, as they tend to be in a state of disbelief when presented with such bad news.

Ms. Simms wanted a second opinion to confirm the baby's condition, and the nurse identified a clinic in Cincinnati.   After the office arranged a referral, Ms. Simms travelled to the Cincinnati Fetal Care Center on May 30, 2008.   A number of specialist physicians and others played roles in testing and evaluating the fetus' condition, culminating in a conference with Ms. Simms led by Dr. Hopkin.   During this consultation, Ms. Simms learned that some of the fetus' abnormalities would have been evident in earlier ultrasounds.   Following this presentation by the specialists, Ms. Simms met with a staff counselor, Ms. Peach, who reviewed the consultation, answered other questions, and stated that pregnancy termination would have been an option at up to 20 weeks gestation but was now too late.   Dr. Polzin prepared a summary of the clinic's evaluation and sent it to Dr. Singh.   In addition, Dr. Hopkin prepared a letter to Ms. Simms, providing her with their conclusions as to the diagnosis of her fetus.   None of the doctors recalled or noted in the medical record that termination was discussed.   No one identified any health risks to Ms. Simms connected to the abnormal development of her fetus, although a serious health risk to the mother is often a condition for lawful late-term termination of pregnancy.

Because she feared that, as the doctors had advised, her fetus might be stillborn, Ms. Simms went from the clinic in Cincinnati back to her hometown and directly to a funeral home to make arrangements.   Ms. Simms testified that had she been informed two and a half months earlier of the abnormalities later identified, she would have terminated her pregnancy.   As

instructed by the clinic, Ms. Simms was seen on June 13, 2008, by Dr. Chaffin for an ultrasound. The fetus had a large head, increasing the risk of a difficult delivery.   Returning on June 15 for the results, she was quickly admitted to the hospital so labor could be induced.   Ms. Simms was in labor for two days before Caelan was born at 34 weeks gestation.

Misty Simms gave birth to her son on June 18, 2008.   Although delivered at 34 weeks of gestation, and weighing only 5 lbs. 4 oz., prematurity seems of little significance.   In fact, Caelan's brain had not been forming properly since early in Ms. Simms's pregnancy.   At birth, Caelan's brain had tragic, profound abnormalities: his brain stem was poorly formed and kinked; he had hydrocephalus, with excessive fluid in and around the ventricles (ventriculomegaly); he had "cobblestone" lissencephaly, a particularly severe malformation of the cerebrum; and he suffered a host of related and additional problems.   As a result of these conditions, since birth Caelan has been rendered into what some of his physicians characterize as a vegetative state, and he will remain irreversibly in this state until his death.   His malformed brain stem impairs basic bodily functions.   He has no voluntary movement and little reaction to any form of stimuli.   He cannot sit up or turn his head.   He must be fed through a feeding tube; he swallows with considerable difficulty, requiring an attendant to swab and suction his saliva.   Caelan has muscular dystrophy and cerebral palsy with spasticity, causing very low muscle tone.   A shunt was placed in his head when he was nine months old and remains in use.   He is subject to numerous seizures every day.   As his muscular dystrophy has progressed, his doctors have performed a tracheostomy to support his respiratory capacity with a ventilator at night.   In his first seven years of life, a number of surgical procedures and complex drug treatments have been used to manage his symptoms and complications.

Although essentially stable, and unchanged in outlook, Caelan's condition requires around-the-clock attention.   He literally cannot do anything for himself, but he also cannot be left unattended for more than a matter of minutes or hours, due to the seizures, his difficulty breathing and swallowing, and other inherent limitations.   Misty Simms has been a real-life superwoman in her diligent and competent care for her son.   She has been his mother, nurse, and care-giver on a daily basis, providing a remarkable level of loving attention to Caelan's extremely demanding needs.   By all accounts, Ms. Simms's devotion to Caelan is an immeasurable factor in his survival, as the excellent care provided by his physicians and other providers is enhanced by her constant efforts.   She is the glue which holds together the complicated network of providers and care necessary to sustain Caelan's life.

Prior to trial, the Court granted partial summary judgment to Plaintiff on the first two elements of her wrongful birth claim: duty and breach of the standard of care.   The issues of causation and damages were left for trial.   We now know that some previously unidentified genetic disorder may have played the determinant role in Caelan's condition; no person is to blame for causing Caelan's disorder.   Rather, the issue here is Ms. Simms's right to make an informed decision, based upon appropriate medical information, as to whether to legally terminate her pregnancy.   *See Caserta*, 332 S.E.2d at 879.   Although the devastating effects of Caelan's abnormal brain development were not caused by Defendant, the Court finds that Defendant's breach caused Ms. Simms to lose the opportunity to make an informed choice regarding termination of her pregnancy. Ms. Simms was denied that right by Defendant's negligence. Failing to provide proper medical care and depriving her of critical information about the almost-certain level of abnormality her child would suffer, the Defendant's conduct violated the standard of care and effectively eliminated any choice for Ms. Simms.   The Court concludes that

6

Defendant's negligence forced Ms. Simms to continue her pregnancy despite the catastrophic lack of brain development in her fetus.   Though her love and devotion cannot be doubted, she testified without hesitation that, had she been properly informed at an earlier stage, when termination was reasonably available in this or nearby states, she would not have continued her pregnancy.   The Court is persuaded that this is true.

First, in February 2008 Defendant failed to timely refer Ms. Simms to a specialist and to inform her of the fetus's birth defects, effectively depriving her of the opportunity to choose whether to continue her pregnancy.   The early ultrasounds and subsequent diagnostic testing by more advanced techniques provided a clear diagnostic picture that Caelan's malforming brain and other problems were evident within the first twenty to twenty-two weeks.   The February 25 ultrasound, which alarmed Dr. Booth and the sonographer, revealed hydrocephalus and other indications of abnormal development, requiring a follow-up ultrasound within a few weeks. When finally obtained at thirty weeks on May 14, repeat ultrasounds revealed the worst: the significant progression of the malformations observed on February 25.   Subsequent testing, including magnetic resonance imaging (MRI), confirmed that Caelan's abnormal development should have been diagnosed at a much earlier stage, and likely would have been evident had a post-February 28 ultrasound been performed as ordered.

Both the treating physicians and the experts concluded that Caelan's seriously malformed brainstem, his hydrocephalus, small cerebellum, and other abnormalities were visible at the twenty to twenty-four week gestational level.   Dr. Hopkin, the consulting pediatric clinical geneticist in Cincinnati, testified that at twenty-two weeks of gestation an MRI would have shown many of the malformations Caelan ultimately suffered.   His small cerebellum, kinked brainstem, and hydrocephalus, all considered together as a variety of Dandy-Walker Syndrome, were visible at

that time, and most probably would have been considered as also suggesting Walker Warburg Syndrome.   These findings would have indicated a severely disabled fetus, with still-birth or early death probable, and would have led a physician to discuss termination of pregnancy as an option. At that point in her pregnancy, legal abortion was still available in Ohio.

Likewise, Dr. Polzin testified that an earlier MRI or ultrasound would have led to a similar list of likely diagnoses.   Such findings would have been sent to the patient's treating physician, who would have then discussed the patient's options, including termination.   Defendant's expert, Dr. Holmes, a pediatric neurologist, also opined that an MRI of Caelan at twenty-two weeks gestation would have revealed the Dandy-Walker cyst and kinked brainstem, both suggestive of Walker Warburg syndrome.   Dr. Barnes, Defendant's neuroradiologist expert, testified that the brain stem defect had occurred and the Dandy-Walker malformation would have been in place by week twenty-one and observable at that time.

From this evidence, the Court concludes that the neglect to provide follow-up care after the February 25 ultrasound proximately caused Misty Simms to be deprived of essential information, preventing her from exercising her right to terminate her pregnancy.   Had the repeat ultrasound been performed, her physician, Dr. Booth, or Dr. Chaffin probably, almost certainly, would have confirmed by twenty-two or twenty-four weeks that Ms. Simms's fetus was severely malformed, with a likely diagnosis of Walker Warburg Syndrome.   Had she been presented with this information, she would have chosen to terminate her pregnancy.   The significant possibility of a stillbirth or very short neonatal survival, with every reason to believe her child would be severely disabled, would have led her to terminate.

Second, the evidence does not support a finding that termination was still an option after the visit to Dr. Singh's office or the specialists in Cincinnati.   The testimony offered at trial

showed that at that time only Kansas had a medical facility which could perform late-term termination, and then only if the mother herself faced imminent harm from continuing the pregnancy.   There is no evidence that Ms. Simms was at risk.   But even if termination was still a possibility at the time Ms. Simms learned of her baby's complications, it was not a reasonable option for her.   That she eventually did learn of Caelan's tragic prospects and then received quick confirmation from the doctors in Cincinnati does not alter the conclusion that she was deprived of the opportunity to make an informed choice.   Until well into the last trimester of her pregnancy Ms. Simms had every reason to believe her pregnancy was normal and her baby was healthy.   Her second child, this baby's development appeared to her to be progressing well.   To learn in Dr. Singh's office that, in fact, her baby's brain was severely underdeveloped, with other significant abnormalities, devastated Ms. Simms.   Naturally, she was overwhelmed and in denial, and sought a second opinion.   By the time the worst was confirmed in Cincinnati, it was too late for her to have any meaningful choice.   Ms. Simms was not notified by any of her physicians, at least in any manner that she could reasonably comprehend, that termination was an option at such a late point in her pregnancy.   Moreover, at that time, termination was only theoretically possible in a distant state, and at a high cost, if at all.

Understandably, carrying her child in blissful ignorance for thirty weeks, only to be told, bluntly, that her baby was badly malformed, left Ms. Simms in a confused shock.   Having this nightmare confirmed by a team of specialists, and learning that she should have been informed of this nearly three months before, added to her emotional distress.   Given these circumstances, Ms. Simms reasonably believed that her pregnancy would end with a stillbirth or a baby with a very short lifespan.   Defendant's failure to timely notify Ms. Simms of her baby's birth defects caused

her to lose the opportunity to choose to terminate her pregnancy, and resulted in both economic and noneconomic damages.

### III.    DISPUTED ISSUES REGARDING DAMAGES

A significant portion of the testimony at trial concerned the issue of damages.   Caelan's past medical bills have been covered in part by West Virginia Medicaid.   There is no dispute as to the fact that the past medical bills for Caelan totaled $2,615,899, of which West Virginia Medicaid paid $1,042,067.   Plaintiff's Exhibit No. 48.   The plaintiff and defendant have differing interpretations, however, of the effect of state and federal Medicaid laws on the damages in this case.   Furthermore, the parties disagree on issues such as Caelan's life expectancy and life care plan, which further complicates the calculation of damages in this case.   The Court addresses each of these disputed issues in turn below.

### A. Past Medical Expenses Covered by Medicaid

The Government contends that Plaintiff does not have a chose in action for, and have no right to recover from the Government, the amount of Caelan's past medical expenses that were covered and paid by Medicaid.   *See* ECF No. 201.   The Government argues that, by operation of federal and state Medicaid statutes, Plaintiff has assigned her right to sue and recover these expenses to the State of West Virginia.   Under the Government's theory, the State itself must file suit if it wishes to recover these expenses.   Plaintiff cannot sue the federal government for payments made by the State.   Plaintiff disagrees; she argues that they incurred the medical bills and therefore have the right to sue to recover the entire cost of Caelan's past medical care.   *See* ECF No. 203.   Plaintiff agrees that they have assigned to the State the right to payment for the amount of past medical expenses covered by Medicaid.   Plaintiff maintains, however, that the proper mechanism by which the State will recoup those costs it through a subrogation lien against

10

any damages for past medical expenses that they are awarded in this suit against the Government.

Medicaid is a program created pursuant to federal law by which the federal government provides financial assistance to the states for medical care.   Each state has its own state Medicaid program that uses the federal funds, as well as state funds, to reimburse providers for medical care provided to persons in need.  *See Harris v. McRae*, 448 U.S. 297, 301 (1980).   The federal Medicaid laws include certain requirements that each state program must meet in order to receive Medicaid funds.   *See id.*

Several of the requirements for state Medicaid programs are set out in Title 42, Section 1396a of the United States Code.   Among those requirements is the condition that a state plan must require the agency administering the plan to "take all reasonable measures to ascertain the legal liability of third parties . . . to pay for care and services available under the plan."   42 U.S.C. § 1396a(a)(25)(A) (2012).   If the agency finds that a third party is legally liable for medical expenses after the program has provided Medicaid assistance to a recipient, the agency must "seek reimbursement for such assistance to the extent of such legal liability."   *Id.* § 1396(a)(25)(B). Furthermore, the state must enact laws under which, where a third party is liable for a Medicaid recipient's medical expenses, the state acquires the right of the recipient to payment for those expenses by the third party.   *Id.* § 1396(a)(25)(H).   Specifically, the state is required to provide that, as a condition of eligibility for assistance under Medicaid, recipients must assign to the state any rights of the recipient, or any individual on whose behalf the recipient has authority to execute an assignment of rights, to payment for medical care from a third party.   42 U.S.C. § 1396k(a)(1)(A).   Finally, the state is not permitted to impose a lien against the property of a recipient to recoup funds for medical assistance that the state Medicaid program has provided to the recipient.   42 U.S.C. § 1396p(a)(1).

West Virginia participates in the Medicaid system and has enacted provisions to create a state plan that complies with the federal requirements outlined above.   Section 9-5-11 of the West Virginia Code states: "Submission of an application to the department for medical assistance is, as a matter of law, an assignment of the right of the applicant or his or her legal representative to recover from third parties past medical expenses paid for by the Medicaid program."   W. Va. Code. § 9-5-11(b)(1).   The state law indicates, however, that this assignment "does not prevent the recipient or his or her legal representative from maintaining an action for injuries or damages sustained by the recipient against any third-party and from including, as part of the compensatory damages sought to be recovered, the amounts of his or her past medical expenses."   *Id.* § 9-5-11(b)(4).   If a recipient sues a third party for medical expenses covered by Medicaid, the West Virginia Department of Health and Human Resources, which administers Medicaid, "shall be legally subrogated to the rights of the recipient against the third party."   *Id.* § 9-5-11(b)(5).   The department has the right to be paid first out of any payments made to the recipient for past medical expenses covered by Medicaid.   *Id.* § 9-5-11(b)(6).   Thus, in the case of a verdict for a recipient against a liable third party, "the court shall direct that upon satisfaction of the judgment any damages awarded for past medical expenses be withheld and paid directly to the department, not to exceed the amount of past medical expenses paid by the department on behalf of the recipient." *Id.* § 9-5-11(g)(3).

In the present case, the Government is liable for Caelan's past medical expenses, some of which were paid by West Virginia Medicaid.   Plaintiff sued the Government directly to recover these expenses.   The Government maintains that, to the extent that West Virginia law permits Plaintiff to do this, it is in conflict with, and is preempted by, the federal Medicaid laws. Specifically, the Government argues that the subrogation lien mechanism conflicts with Section

1396a, which requires assignment of the recipient's rights, and Section 1396p, which prohibits liens.   ECF No. 201.   The Court disagrees.   The Government has provided no authority for the proposition that West Virginia's system violates federal law.   Instead, the Government rests its argument on the definition of the term "assignment," as it is used in the federal Medicaid statutes.  ECF No. 201.   According to the Government, an "assignment" transfers "*the entire right or chose in action* for the recovery" of medical expenses covered by Medicaid, leaving the recipient with no method of recovering these expenses.   ECF No. 201 (emphasis in original).

The Government cites *Arkansas Department of Health and Human Services v. Ahlborn*, 547 U.S. 268 (2006) to support its interpretation of the term "assignment."   In *Ahlborn*, the Supreme Court examined the Arkansas Medicaid system, which distributes settlements and judgments recovered from liable third parties using a method almost identical to that used by West Virginia.   *See Ahlborn*, 547 U.S. at 272 ("When a Medicaid recipient in Arkansas obtains a tort settlement following payment of medical costs on her behalf by Medicaid, Arkansas law automatically imposes a lien on the settlement in an amount equal to Medicaid's costs.").   The issue in *Ahlborn* was whether Arkansas could enforce a lien against the entirety of a recipient's judgment to recoup all of the past medical expenses that Medicaid had paid, or only against that portion of the award that represented the recipient's past medical expenses.   *Id.* at 275.   Notably, the Court in *Ahlborn* specifically stated: "That the lien is also called an "assignment" does not alter the analysis.   The terms that Arkansas employs to describe the mechanism by which it lays claim to the settlement proceeds do not, by themselves, tell us whether the statute violates the anti-lien provision."   *Id.* at 286.   Accordingly, the Government's restrictive interpretation of the term "assignment" is not supported by the analysis in *Ahlborn*.[2]

---

[2] Although the Government cites *Ahlborn* to support its definition of the term "assignment" in the

Moreover, although the subrogation lien mechanism as a whole was not directly challenged in *Ahlborn*, the Court discussed it at length. Specifically, the Court explained that such a mechanism does not violate the federal anti-lien statute. *Id.* at 284. Sections 1396a(25) and 1396k(a) carve out a limited exception to the federal anti-lien provision for "payments for medical care." *Id.* at 284-85. Accordingly, the Court held that Arkansas's lien mechanism is valid insofar as it is applied to the specific portion of a settlement or judgment that represents medical expenses. *Id.* A lien against any other portion of a recipient's damages, such as lost wages, does violate the anti-lien provision. *Id.* at 285.

*Ahlborn* thus contradicts the Government's contention that the State cannot enforce a subrogation lien again the portion of the Plaintiff's judgment that represents Caelan's past medical expenses that have been covered by Medicaid. Furthermore, if a lien against a judgment obtained by a Medicaid recipient or a recipient's agent is valid, it follows that the recipient or agent has a chose in action to recover such a judgment. Accordingly, Plaintiff has the right to bring suit to recover the cost of Caelan's past medical care that has been paid by Medicaid, with any such recovery subject to a lien by the State.

### B. Past Medical Expenses Beyond Those Covered by Medicaid

Before trial, the Court ruled that, pursuant to West Virginia law, the total amount of Caelan's medical bills, before Medicaid payments and write-offs, represents Plaintiff's damages for medical expenses. In *Kenney v. Liston,* the Supreme Court of Appeals of West Virginia held:

> The plaintiff may recover the full amount of his or her reasonable and necessary medical expenses, even if those expenses were later discounted and a portion written off by the health care provider. Regardless of how, or even whether, the plaintiff's obligation to the

federal Medicaid statutes, not Arkansas or West Virginia's Medicaid laws, the state statutes are enacted pursuant to the requirements set out in the federal statutes and thus the term is likely meant to have the same meaning. Furthermore, the Court does not find support for the Government's rigid interpretation of the term in any part of the *Ahlborn* opinion.

medical provider was later discharged, the plaintiff became liable for the bills when the services were received; the plaintiff is therefore entitled to recover the value of the services.

*Kenney v. Liston*, 760 S.E.2d 434, 445-46 (W. Va. 2014).   This amount includes the cost of his medical care above the amounts paid by Medicaid, even though those amounts were written off. The Government contends that, despite the holding in *Kenney*, state and federal law prohibit the Plaintiff from recovering the cost of Caelan's past medical care beyond the amount that has been paid by Medicaid.   ECF No. 204.

First, the Government explains that under the federal Medicaid laws, medical care providers cannot seek payment for services above the amount paid by Medicaid for those services. ECF No. 201.   It asserts that Plaintiff has assigned the right to bring suit and recover damages for past medical services paid by Medicaid.   Thus, the Government concludes, they have assigned the right to the only past medical expenses that are recoverable.   ECF No. 204.   The Government further argues that any state law in conflict with these federal restrictions is preempted.   As explained in the preceding section, Plaintiff has not assigned the right to bring suit against a liable third party for Caelan's past medical expenses.   Moreover, the federal Medicaid statutes dictate that neither the state nor medical care providers may seek payment for the services provided to a Medicaid recipient beyond the amount paid by Medicaid.   *See* 42 U.S.C. §§ 1396a(a)(25)(C), 1396p(a)(1).   The statutes are silent, however, as to what specific damages Medicaid recipients may recover from a liable tortfeasor.   Accordingly, these statutes do not preempt *Kenney*.

Second, the Government argues that Section 9-5-11 of the West Virginia Code does not provide for the recovery of past medical expenses beyond those covered by Medicaid.   ECF No. 204.   Section 9-5-11 sets out the assignment of rights and other provisions related to third party liability under the West Virginia Medicaid program.   The statute specifically states:

15

> This section does not prevent the recipient or his or her legal representative from maintaining an action for injuries or damages sustained by the recipient against any third-party and from including, as part of the compensatory damages sought to be recovered, the amounts of his or her past medical expenses.

W. Va. Code. § 9-5-11(b)(4).   Nothing in this language differentiates between past medical expenses covered by Medicaid and expenses beyond the amount paid by Medicaid.

Finally, the Government argues that the recovery of past medical expenses that were written off results in a "windfall" to the Plaintiff.   The Government cites *Tristani ex rel. Karnes v. Richman*, 652 F.3d 360 (3d Cir. 2011), in which the U.S. Court of Appeals for the Third Circuit explained that Congress never intended Medicaid beneficiaries to receive a windfall by recovering medical costs they did not pay.   *Tristani*, 652 F.3d at 373.   The issue in *Tristani*, similar to that addressed in *Ahlborn*, was whether the federal anti-lien provision prohibits states from imposing liens on the property of Medicaid recipients in order to recover past medical expenses.   *Id.* 362. In determining that states may impose such liens, the court explained that prohibiting such liens would permit a significant windfall to Medicaid recipients.   *Id.* at 373.   The court addressed the concept of a windfall in determining whether states were entitled to recover the expenses they had already paid through the Medicaid program.   *See id.*   The court did not specifically discuss amounts that the state did not pay but, rather, that were written off by medical providers.   *Kenney* directly addresses this issue.   The Court in *Kenney* explained that past medical expenses are calculated when they are incurred, regardless of any later coverage or write-offs, and thus a plaintiff may recover the full amount of these expenses.   *Kenney*, 760 S.E.2d at 445-46.   As the holding in *Kenney* is not preempted by federal law, it governs this case.   Thus Plaintiff may recover Caelan's past medical expenses, above the amounts covered by Medicaid, even though those amounts were written off.   Plaintiff is entitled to recover the entirety of Caelan's past medical expenses that were billed to Medicaid, in the amount of $2,615,899, and the Court awards

16

that amount to Plaintiff.

### C.  Setoff for Medical Expenses Covered by Medicaid

In a pretrial order, the Court held that the Government is not entitled to a setoff from the total amount of Caelan's medical bills based on Medicaid payments made on those bills.   ECF No. 183.   The Government challenges this ruling, arguing that it is entitled to a setoff because Medicaid is largely funded by the federal government and thus the Government has already paid for much of Caelan's medical expenses.   ECF No. 201; ECF No. 203.   Under West Virginia's collateral source rule, payments made to a plaintiff from a collateral source, that is, from a source "other than the tortfeasor," do not reduce the tortfeasor's liability to the plaintiff.   *Kenney*, 760 S.E.2d at 440.   Medicaid payments and gratuitous write-offs are considered collateral sources which do not offset the tortfeasor's liability.   *Id.* at 442-444.   As explained in the pretrial order, the state Medicaid program paid Caelan's medical bills.   The State is responsible for administering the state Medicaid program, paying health care providers, and setting rates for reimbursement.   That a significant portion of the money in the state Medicaid system comes from the federal government does not mean that the State is not the source of the funds provided to Caelan.[3]   Accordingly, it is the State, and not the federal government, that made payments for past medical expenses.   Thus, under West Virginia's collateral source rule, the Government is not entitled to a setoff.

---

[3]  In its reply, the Government cites to *Felder v. United States*, 543 F.2d 657, 670 n.17 (9th Cir. 1976) and *Dempsey ex rel. Dempsey v. United States*, 32 F.3d 1490 (11th Cir. 1994) to support its position that the Government is the source of a portion of the Medicaid payments made on Caelan's medical bills.   ECF No. 204.   Those cases addressed whether the federal government was the source of payment for unpaid federal income taxes and Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") payments, respectively.   Federal income tax funds and CHAMPUS payments differ in kind from Medicaid payments, as only the latter include state funds and are distributed by state agencies through state programs.

### D. Future Medical Expenses

It is the Government's position that Caelan will continue to be covered by Medicaid in the future and that any future medical expenses will be covered by the same federal and state Medicaid laws as his past medical expenses.   ECF No. 204.   Thus, the Government argues, any damages for future medical expenses should be subject to the same setoff that the Government seeks for past medical expenses.   For the reasons set out in the preceding section, the Government is not entitled to a setoff.

Alternatively, the Government argues that any damages awarded for Caelan's future medical expenses should be placed in a reversionary trust.   ECF No. 201.   Plaintiff opposes imposition of a reversionary trust, arguing that it would not be in Caelan's best interests.   ECF No. 203.   The Court finds that West Virginia law applies to the issue of damages in this case.   *See* 28 U.S.C. § 2674 (2012).   No West Virginia statute or regulation requires the Court to impose a reversionary trust here. The Court thus declines to do so.

### E. Findings of Fact as to Life Expectancy

#### 1. Life Expectancy According to Physicians

Both parties utilized life care planners to evaluate the damage claims.   At trial Plaintiff decided to adopt and rely upon the Defendant's life care plan prepared by Shelene Giles. Apparently, the life care plan experts were not far apart on how they evaluated Caelan's needs. Each plan was similar in most respects and reasonable, both in approach to the medical and other evidence of Caelan's needs and, ultimately, in the projected annual costs.   Where they differed dramatically, and where counsel for the parties focused their trial evidence and arguments, is in their estimates of Caelan's life expectancy.   Indeed, this issue is easily the most challenging and most important contested issue for the Court to resolve.

Caelan's condition is, fortunately, as rare as it is tragic.  The impressive collection of physicians who provided care or consulted as experts are likely some of the country's most experienced and knowledgeable physicians with expertise in treating children like Caelan.   They have kept abreast of the literature, and revealed a deep knowledge of Caelan's lengthy and complex medical history, from early gestation through the excellent care he has received in his first seven years of life.   Their opinions and analyses are relatively consistent with each other in describing the unique characteristics of Caelan's unfortunate medical conditions, but there are areas of dispute.   Though in agreement that severe developmental abnormalities of the brain and other organs fall on the continuum between Walker Warburg Syndrome, on the worst end of the scale, and Muscle-Eye-Brain Syndrome, seriously disabling but less severe, they disagree on where to place Caelan in this diagnostic range.

The significance of Caelan's placement on the continuum between these syndromes is magnified here because the literature and the experts' knowledge support a very different life expectancy range for patients with these different diagnoses.   Children afflicted with Walker Warburg Syndrome are likely to be stillborn or die within three years of birth. With Muscle-Eye-Brain Syndrome, children have a much longer life expectancy, even into their twenties or beyond.   But with such an unusual diagnostic challenge in distinguishing these syndromes and, thankfully, a small number of patients, there simply is no sampling which is relatively certain, or even a clear source of data, upon which life expectancy may be fixed. Instead, Caelan's life expectancy must be estimated based upon his own unique characteristics and course of treatment, to place him somewhere within the range most likely to occur given his constellation of problems.

19

Defendant's expert, Dr. Holmes, labeled Caelan's condition as cobblestone lissencephaly with Walker Warburg Syndrome and opined that Caelan would not live past ten years of age. Though he acknowledged that Walker Warburg Syndrome usually causes death by age three, he noted that there are no conclusive life expectancy studies and treatment has improved even recently. Since this condition is a syndrome—a combination of findings, symptoms, and conditions frequently presented together, but varying patient-to-patient—assessing its effect on the life expectancy of a particular patient is difficult.   In Caelan's case, Dr. Holmes believed that the cobblestone lissencephaly, often associated with Walker-Warburg Syndrome, posed the greatest factor in Caelan's mortality.   He rejected the notion that life expectancy dictates the diagnosis, that a child who survives past age three is not likely to suffer Walker-Warburg Syndrome because so many with that diagnosis do not live that long.   Dr. Holmes based his opinion of life expectancy on several key and individualized factors.   First, he concluded that Caelan's brain development was so substantially limited that his brain will simply give out, that it will not be able to sustain necessary functions for many more years.   Next, he gave much weight to Caelan's history of seizures and infections which, although well treated by his mother and doctors, present nearly constant threats to his survival.   He also advised that Caelan's muscular dystrophy is progressive, and will make respiration and other functions like swallowing more difficult over time.

Dr. Barnes, a pediatric neurologist, agreed with Dr. Holmes that Walker-Warburg Syndrome was the correct diagnosis.   He found that the radiology reports from birth through age three presented brain images most consistent with Walker-Warburg Syndrome, citing Caelan's kinked brain stem and cobblestone lissencephaly.   But he also acknowledged that, in addition to imaging studies, a full clinical picture should be considered before a definitive diagnosis is made.

On the other side of the issue are the opinions of two of Caelan's treating physicians.   Dr. Hopkin had opined, based upon the prenatal MRI, that Walker-Warburg Syndrome was the probable diagnosis.   However, after Caelan was born, Dr. Hopkin continued to participate in his treatment.   Genetic testing results were not consistent with Walker-Warburg Syndrome, though not conclusive as to any genetic cause of Caelan's problems.   Even so, according to Dr. Hopkin, when considered with other findings and the course of treatment, Caelan's clinical picture supports the diagnosis of Muscle-Eye-Brain Syndrome.   He could not provide, however, a life expectancy. He described Caelan's principle difficulties as progressive over time, but recognized that Caelan had been stable.   His diagnosis changed to Muscle-Eye-Brain Syndrome in part because Caelan had survived well past the expected survival range for Walker-Warburg Syndrome but also as a result of the rest of the clinical findings made over Caelan's life.   Though not offering a specific life expectancy, he testified that the literature reported a survival range with Muscle-Eye-Brain Syndrome of ten to thirty years.

Dr. Payne, Caelan's primary physician since about one year of age, also concluded that Muscle-Eye-Brain Syndrome was the right diagnosis.   She relied upon the clinical record, including imaging reports, but also the genetic testing and Caelan's course of treatment.   Though she, too, declined to provide an opinion on life expectancy, she agreed that the medical literature and her own experience supported a life expectancy into teenage years, even into the twenties or thirties.   Dr. Payne has provided excellent care to Caelan, and observed that Ms. Simms has played an important role in Caelan's survival to this point.   While Caelan still experiences seizures, progressive muscular dystrophy impairing his breathing and swallowing, and other life-threatening challenges, he has been relatively stable and crisis-free in recent months.

21

### 2.  Expert Witnesses on Life Expectancy

Two witnesses provided non-medical opinions on Caelan's life expectancy. The defendant submitted Dr. Robert Shavelle, an epidemiologist, who has performed research, published numerous articles in peer-reviewed medical journals, and consulted with life insurance companies. Plaintiff tendered Dr. Michael Freeman, also an epidemiologist who serves on the faculty of a medical school and on various editorial boards of journals principally involved in forensic matters, to rebut Dr. Shavelle's opinions. Each witness was deposed prior to trial and offered testimony, by agreement of the parties, through submission of their respective deposition transcripts. The Court has read each witness' testimony and considered them helpful but not dispositive in determining Caelan's life expectancy.

First, the nomenclature associated with their discussions of "life expectancy" requires brief explanation. The experts agree that "life expectancy" means the average number of years of life remaining for members in a group of similar persons. For Caelan, this means the average number of remaining years of life from age six, his age at the time of trial, for children of a similar condition. Because so few persons suffer the same condition as Caelan, a condition which is disputed in terms of diagnosis but undisputed in the symptoms and limitations he has, studies only generally apply to him. Thus, both experts cite to studies of life expectancy and mortality rates for groups which suffer from cerebral palsy, various severe physical limitations, and severe learning disabilities. Dr. Shavelle identified more than fifty published studies, and specifically relied upon nine particular publications, to categorize Caelan's relevant conditions and apply the studies to him. Generally, Dr. Freeman quarreled with how Dr. Shavelle applied the studies because most, perhaps all, of the studies used data from individuals younger than Caelan in the cohort. Since Caelan has already survived to nearly age seven, relying on life expectancy

22

calculations which include individuals in the group who did not live until age six would skew the result.   This concern is particularly acute in Caelan's situation, as most everyone involved in his early care did not expect him to live this long and because he benefits from excellent care.   Dr. Freeman criticized Dr. Shavelle's use of a median age of death to guide his opinion, stating that by definition half of similarly situated individuals would survive beyond that age, a standard insufficient for determining how long a life care plan should be.

Dr. Shavelle's analysis and sources are nonetheless instructive.   He referenced studies based on data reflecting clinical findings for individuals with severe disabilities similar to those suffered by Caelan. Focusing on the severity of Caelan's cerebral palsy, the need for a tracheostomy and need for a ventilator at times, Dr. Shavelle found his life expectancy to be in the range of ten to eleven additional years.   Dr. Freeman advocated a different approach, noting a recent study of severely disabled children, and opined that it is reasonably likely that Caelan would survive to an age range of twenty to twenty-five years, and reasonably possible that he could live thirty to thirty five years.   With so few examples of other persons with these afflictions, the life expectancy analysis by Dr. Shavelle, adjusted by the Court to reflect Dr. Freeman's valid criticisms and the success of recent care from Caelan's providers, is the best evidence of Caelan's life expectancy.   His analysis provides firmer footing by giving proper weight to the medical evidence and determining the probability that Caelan's life span will likely fall on the shorter term of the estimated range.   Caelan has a progressive condition and many risk factors, several of which are potentially life-threatening.   This Court must perform the morbid task of estimating from the evidence available how long Caelan will likely survive, a necessary but inherently speculative endeavor.   *See Crum v. Ward*, 122 S.E.2d 18, 39 (W. Va. 1961) (Haymond, President, dissenting) ("[N]othing . . . could be more speculative than the life expectancy of a particular

person.").   The Court concludes that Caelan's life expectancy is fourteen additional years.   That is, it is probable that he will live to only twenty-one years of age.[4]

### F.  Findings as to the Life Care Plan

Although Plaintiff employed a life care planner as one of her experts, they chose to use Defendant's life care planner, Shelene Giles, at trial as the experts' reports were similar.   Ms. Giles provided several revised reports, updating her findings as new information became available.   At trial, Plaintiff submitted, without objection, the deposition of Ms. Giles, Plaintiff's Exhibit No. 70, along with her latest revised report, Defendant's Exhibit No. 9.   Defendant's also called her to testify to address several key areas in dispute.

Ms. Giles is well-qualified to offer her expertise in preparing a life care plan for Caelan.[5] She employed a methodology consistently applied in the field, which included reviewing the lengthy medical records and billings and gathering other information about Caelan's needs.   Her life care plan for Caelan covers the reasonable, necessary medical care and services and the equipment and therapeutic services important to caring for him.[6]   Within each category, Ms. Giles provided appropriate details, specified the frequency of the component, and estimated the cost at that frequency.   Her plan and her trial testimony offered options with two primary variables: first, the skill level and source of the nursing care to carry out the plan, and second, Caelan's life expectancy.   Ms. Giles prepared four tables to list the costs of lifetime nursing care to Caelan consistent with the four "options" she identified:   License Practical Nurse ("LPN") through an

---

[4] Caelan was six and a half years old at the time of trial, but will turn seven in several weeks. Therefore, the Court has calculated Caelan's life expectancy based on a current age of seven years.
[5] Ms. Giles holds degrees in psychology, rehabilitation counseling, and nursing.   She has also earned professional certifications in life care planning.
[6] Throughout the testimony of Ms. Giles and Dr. Brookshire, a few specific, narrow issues were raised, such as the frequency of therapeutic services.   The plan called for six-month intervals, but Plaintiff's counsel made a case for greater frequencies, such as monthly intervals.   The differences in costs are minor in the overall context of the life care plan.

agency, LPN privately hired, Registered Nurse ("RN") through an agency, and RN privately hired. Each table also includes separate columns listing the annual costs of each category of recommended care and then lifetime estimates for ages 10, 14.5, 16.5, and 17.5 (based on a range of remaining life expectancy of four to eleven years). With respect to the skill level of nursing care, Ms. Giles explained that Caelan's condition requires skilled nursing care around the clock.[7] West Virginia nursing standards allow LPNs, if adequately trained and supervised, as well as RNs to provide this level of care. Because Caelan suffers from severely disabling conditions which produce complex symptoms, such as seizures and apnea, this Court accepts Ms. Giles conclusion that skilled nursing care is required for Caelan but that LPNs are able to provide the services needed. Currently, Medicaid supplies an LPN for sixty hours each week. Ms. Simms, now obviously knowledgeable and experienced in caring for Caelan, has provided much of his care though she would fall within the unskilled category. Ms. Giles then offered two different approaches to hiring nursing care, explaining that nurses could be hired through a home health care company or by direct hire, a less expensive option. The Court finds the former reasonably necessary. To arrange long term, twenty-four hour coverage and supervision, going through an agency is the most appropriate method. If private direct hiring were undertaken, Ms. Simms would be required to act as employer, supervisor and coordinator of a staff of nurses, tasks well beyond her time, energy, and capabilities. Though Ms. Giles's plan is comprehensive, it omits any future hospitalization costs although Caelan's first seven years have witnessed numerous hospitalizations. His condition is such that hospitalizations are certain to occur, but no one can

---

[7] Ms. Giles concluded that Caelan's condition is so challenging that only two residential pediatric facilities could care for Caelan, and both have very few beds and long waiting lists. Therefore, remaining in his home for care is the only option.

offer anything more than speculation as to when, for what length of time, and for what medical care he will be hospitalized.

The annual cost of this plan option begins at $576,093 in the current year and decreases slightly at the different life expectancy increments through the longest life projection of age 17.5 years in Giles' chart.  With this option, the projected expenditures would total $6,147,959, and each subsequent year would require an additional sum of approximately $550,000.

### G.  Future Economic Loss Related to Life Care Plan

Both sides offered an economist's analysis to project the present value of the life care plan options over different periods of life expectancy.   The defense called Dr. Michael Brookshire, a forensic economist, to testify as to the present value of future economic cost represented by the life care plan.  Dr. Brookshire projected these amounts based upon the different life expectancies resulting in Caelean reaching 10, 16.5, or 17.5 years of age and the skilled nursing options discussed by Ms. Giles.   *See* Table 35, Defendant's Exhibit No. 11.   Dr. Brookshire relied upon a customary methodology to analyze each cost category of the life care plan and then projected the present value totals for each of the three ages or life expectancies and the two nursing options.   *Id.* For the health agency LPN option, the present value totals for 10, 16.5, and 17.5 years of age, respectively, are (rounded): $2,059,000, $5,754,000, and $6,429,000.   Using age 17.5 years and the health agency/LPN option (option 1-A), the present value cost of the life care plan is $6,429,000.   Each subsequent year would cost approximately $529,000 for the health agency/LPN option, slightly reducing each year to reflect the present value calculation.

Mr. Selby, Plaintiff's expert, provided corresponding estimates for ages, by year, up to age 34.  *See* Plaintiff's Exhibit No. 5-1.   The slight variations in their respective estimates for the same life expectancies are the result of very small differences in their methodologies.   Finding

that Caelan's life expectancy is another fourteen years to age twenty-one, the present value of the life care plan is $8,683,196. This is reasonably close to the amount Dr. Brookshire would have estimated using age twenty-one. The Court finds that this life care plan represents the extraordinary costs imposed upon Plaintiff Misty Simms to provide care to Caelan as a result of Defendant's negligence.

### H.   Findings as to Noneconomic Damages

In addition to the cost of a life care plan, Misty Simms is entitled to damages for mental anguish and emotional distress, as the Court ruled in its Memorandum Opinion and Order of December 17, 2014. A statutory cap on noneconomic damages limits the amount of such damages to an adjusted value of $641,544 as of the trial date. Noneconomic loss under the cap would increase by about 2% after 2015.

Here, but for that cap, Misty Simms would be entitled to a much greater amount. From the time she was first informed that her baby would likely be stillborn and certainly be severely disabled, Misty Simms has endured a heavy burden of anguish, disappointment, and stress as a result of being deprived of her right to make an informed choice to terminate her pregnancy. Her state of shock and anger at learning that a botched follow-up appointment gave her no timely warning or practical choice about her pregnancy was then followed by an unceasing and no-doubt oppressive depression over what her child faces, and what she must accept. She faces years of watching her child endure pain and suffer many profound limitations with little enjoyment of what a normal life entails. The Court can do no more than recognize the inadequacy of monetary damages and grant the full amount permitted by law, $641,544, to Ms. Simms.

## I.   Findings as to Lost Earnings of Misty Simms

Plaintiff Misty Simms also makes a claim for lost earnings.   The Court previously determined that such damages are available in a wrongful birth case and are typically included in tort actions.   At trial, Plaintiff offered evidence of lost earnings through her testimony and that of Mr. Selby.   Ms. Simms has been employed intermittently since Caelan was born; however, her employment has been greatly affected by the demands of caring for her son.   She has worked outside the home for some periods, but she has also been paid under the State's Medicaid program as a caregiver for Caelan.   Ms. Simms began attending nursing school but could not continue, as she was required to care for Caelan.   Her vocational plan is to return to nursing if Caelan receives care from another source.   Accepting the assumptions consistent with her plan that she will return to school after next year and attend nursing school for approximately four years and then reenter employment, the Court finds that Ms. Simms, at age 38, will be employed as a nurse by 2020. Taking into consideration her projected income, including benefits, and discounting for participation rates and present value, her future lost income over this period would total $250,751. *See* Plaintiff's Exhibit No. 6.   Applying a 30% federal income tax reduction results in a net income loss of $175,526.[8]   This amount also includes net lost income prior to trial, based on her work as a pharmacy technician which she had to give up to care for Caelan.

---

[8] It is not clear that federal law requires federal income taxes to be deducted from lost earnings. The Federal Tort Claims Act does not address the issue, but merely states that no punitive damages may be assessed against the United States.   28 U.S.C. § 2674(2012).   In *Flannery v. United States*, 718 F.2d 108 (4th Cir. 1983), the U.S. Court of Appeals for the Fourth Circuit held that "federal income taxes must be deducted in computing lost future earnings" because any damages beyond those necessary to compensate the plaintiff for exactly what he lost would be punitive. *Flannery*, 718 F.2d at 111.   The U.S. Court of Appeals for the Seventh Circuit later adopted the reasoning in *Flannery* to hold that a comatose plaintiff could not receive damages for expenses for care already provided by the Veterans Administration or for loss of enjoyment of life because those damages would not actually recompense the patient himself.   *Molzof v. United States*, 911 F.2d 18, 22 (7th Cir. 1990).   The Supreme Court granted certiorari in *Molzof* and reversed the

## IV.     TOTAL DAMAGES AWARDED TO PLAINTIFF

For the reasons set forth above, the Court awards Plaintiff the total amount of Caelan's past billed medical expenses, totaling $2,615,899.   The Court **DIRECTS** the parties to confer and to inform the Court as to how $1,042,067 of this total cost, representing the amount of Caelan's past medical bills paid by Medicaid, will be paid to the West Virginia Department of Health and Human Resources in accordance with Section 9-5-11 of the West Virginia Code.   The Court further awards Plaintiff $8,683,196, the present value of Caelan's life care plan.   The Court awards Plaintiff $641,544 in noneconomic damages.   Finally, the Court awards Plaintiff $175,526 in lost income.   The total amount of damages awarded to Plaintiff is $12,116,165.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:         May 29, 2015

ROBERT C. CHAMBERS, CHIEF JUDGE

---

circuit court's decision, holding that the court's definition of punitive damages was too expansive. *Molzof v. United States*, 502 U.S. 301, 306 (1992).   The Court held that as used in the Federal Tort Claims Act, the term punitive damages has its standard meaning, referring to damages meant to punish defendants for malicious or oppressive behavior.   *Id.*   The term does not encompass damages that merely have a punitive effect because they are excessive.   *Id.* at 308.   *Molzof* thus appears to impliedly overrule the reasoning in *Flannery*.   Here, however, both parties have asked the Court to reduce Plaintiff's lost earnings by the 30% tax rate.   The Court has therefore applied the reduction.